UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **WILLIAM SOSA** | : | **No. 05-44-1** |

Gene E.K. Pratter, J.            Memorandum and Order            January 11, 2006

Defendant William Sosa moves for the suppression of an out-of-court photographic identification made by a witness for trial, as well as any in-court identification of Mr. Sosa by that witness.

**FACTS AND PROCEDURAL BACKGROUND**

William Sosa, along with 16 co-defendants, has been charged in a 26-count indictment which includes charges of conspiracy to participate in the affairs of a racketeering enterprise through a pattern of murder, kidnaping, maiming, drug trafficking and robbery. The alleged enterprise charged is called the "Philadelphia Lion Tribe," the local chapter of a purported criminal organization known as the Almighty Latin King and Queen Nation (the "Latin Kings"). Allegedly, Mr. Sosa is the leader of the enterprise.[1]

One of the charges alleged against Mr. Sosa is the kidnaping and beating of Rafael

---

[1] Mr. Sosa is charged with 25 separate counts, including one count of conspiracy to participate in a RICO enterprise, eight counts of conspiracy to commit murder in aid of racketeering, six counts of using and carrying a firearm during a violent crime, one count of conspiracy to distribute heroine within 1000 feet of a public elementary school, one count of conspiracy to commit robbery and thereby affect commerce, three counts of kidnaping in aid of racketeering, two counts of conspiracy to maim in aid of racketeering, two counts of conspiracy to commit kidnaping in aid of racketeering and one count of attempted murder in aid of racketeering.

1

Guzman.  Mr. Guzman ultimately escaped from his captors and identified Mr. Sosa as one of his abductors from a book containing photographs of purported Latin King members.  It is this identification, in addition to any in-court identification of Mr. Sosa that may be made by Mr. Guzman, that Mr. Sosa seeks to exclude, by way of an oral motion made by his counsel at the final pretrial conference held on January 5, 2006, from trial.  At a hearing to address the motion, the Government presented two witnesses: Mr. Guzman and Special Agent Robert M. Stewart.[2]

At the hearing, Mr. Guzman testified that in the early morning hours of December 23, 2003, he was abducted from his home in Vineland, New Jersey by three men who forced him, at gunpoint, to ride with them to Philadelphia.  During the trip, Mr. Guzman recalled that one of them received a telephone call, which Mr. Guzman heard by way of the "speaker phone" feature, from an individual identified as "Homicide", who was told by the abductors that they had abducted Mr. Guzman as he (the caller) had requested and would soon be arriving in Philadelphia.

Mr. Guzman testified that he was taken to a location in North Philadelphia, where two men were waiting on a street corner.  Mr. Guzman testified that one of these men was "King Homicide", or "Homi", who he later identified to be William Sosa.  According to Mr. Guzman, the five men then took him to a nearby row home and immediately led him through the living room to the basement of the home.  Mr. Guzman testified that both the living room and basement were well lit and that he could see the faces of all of his abductors.

Once in the basement, Mr. Guzman asserts that he was forced to disrobe and sit on a chair, and was aggressively questioned for approximately 20 minutes by the individual now

---

[2] Mr. Stewart was the agent who showed the photograph book to Mr. Guzman.

identified as Mr. Sosa.  Mr. Guzman testified that this person stood between five and eight feet away from him during the entire time that he was questioned.  Mr. Guzman further asserts that after the questioning period was over, this individual, along with the four others, began to beat him.  This beating is purported to have lasted for several hours. Mr. Guzman never lost consciousness during this time.  At one point, the fifth captor then known to Mr. Guzman as "Homi or "King Homicide" put a gun into Mr. Guzman's mouth, became angry upon seeing that Mr. Guzman's chewing gum became stuck on the gun and proceeded to pistol-whip Mr. Guzman.  Additionally, although Mr. Guzman testified that the area near his eyes was injured, he was able to see his captors for the entire time.  After the beating was over, four of the men left the home and the one person who remained in order to guard Mr. Guzman fell asleep.  Mr. Guzman asserts that he reclaimed his clothing and escaped from the home to a furniture shop in the area where he asked for help in getting an ambulance to take him to the hospital.

 Mr. Guzman states that although he was visited in the hospital by both the Philadelphia Police and the FBI, he remained reluctant to tell the truth about who had beaten him for fear of retribution.  However, within about one week after the beating, Mr. Guzman decided to cooperate with the law enforcement authorities and began to provide them with information.  In reporting information to the FBI, Mr. Guzman provided them with a sketch of the living room and basement in the Philadelphia row home to which he had been taken.  The accuracy of these sketches was verified when the FBI conducted a search warrant of the home and evaluated the sketches as being close approximations of the rooms.  Because of his cooperation efforts, Mr. Guzman was relocated out of the area for his protection.

 On April 20, 2004, during a visit to the offices of the FBI in Philadelphia, Special Agent

Stewart [3] presented Mr. Guzman three photo arrays from which Mr. Guzman identified three of the five abductors.[4] There was no photo array that contained Mr. Sosa's photograph.[5] During the same session, but after the photo arrays had been presented, Mr. Guzman was given a book of nineteen photographs by Special Agent Stewart, who asked him if he recognized any of the persons pictured. The photos in the book had been taken from FBI surveillance activities of the ALKQN. Candid surveillance photographs of Mr. Sosa were included in the book on the first two pages.

Mr. Guzman stated that he recognized Mr. Sosa immediately upon opening the book, and indicated to Special Agent Stewart that the man pictured was the fifth captor from the December beating. Special Agent Stewart then asked Mr. Guzman to date and initial the page in the photo notebook on which the fifth abductor was pictured. It is this identification that Mr. Sosa now challenges, arguing that by placing his photo as the first one in the photo book and not placing his photo in an array as the other defendants' photos were placed, Mr. Guzman's identification of him from the photographs was impermissibly suggestive and must be excluded from evidence at trial. Mr. Sosa further argues that the taint arising from this identification process now also

---

[3] Special Agent Stewart testified that he has been employed as an FBI agent for 4 years, and has several years of prior experience as a police officer.

[4] A fourth abductor, known as Roberto Rosado, was well known to Mr. Guzman, so there was no need to identify him by way of photo arrays.

[5] Special Agent Stewart testified that there was no photo array that contained Mr. Sosa's photo because, unlike the other abductor-defendants, there was no "booking" photo of Mr. Sosa available. According to Special Agent Stewart, because of Mr. Sosa's casual appearance in the surveillance photos available to law enforcement authorities, the use of those photos in an array would have been unnecessarily suggestive. These photos of Mr. Sosa were, however, included in a book of surveillance photos gathered in the investigation of the Latin Kings.

precludes any in-court identification Mr. Guzman might make of Mr. Sosa.

**DISCUSSION**

A district court has broad discretion to determine the admissibility of relevant evidence in response to an objection under Federal Rule of Evidence 403. U.S. v. Balter, 91 F.3d 427, 442 (3d Cir.1996). In ascertaining whether an out-of-court photo identification is inappropriately suggestive, "the primary evil to be avoided is 'a very substantial likelihood of . . . misidentification.'" Neil v. Biggers, 409 U.S. 188, 198 (1972). When evaluating a government identification procedure to determine whether the procedure was constitutionally sound, a court must first consider whether the procedure was "unnecessarily suggestive," and, if so, whether the suggestiveness of the procedure created a "substantial risk of misidentification." United States v. Emanuele, 51 F.3d 1123, 1128 (3d Cir. 1995) (citations omitted). The Court of Appeals for the Third Circuit has emphasized that "reliability is the linchpin in determining the admissibility of identification testimony," even where the procedure used is found to have been suggestive. Manson v. Braithwaite, 432 U.S. 98, 105 (1977).

The Supreme Court has found that unnecessary suggestiveness, absent a substantial likelihood of misidentification, is not sufficient to warrant suppression. Biggers, 409 U.S. at 199 ("[t]he purpose of a strict rule barring evidence of unnecessarily suggestive confrontations . . . would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process"). For example, in United States v. Mathis, 264 F.3d 321, 331 (3d Cir. 2001), the court found that the fact that the witness identifying the suspect as a bank robber had seen the identical photo of the defendant in a photo array one month before the robbery in question was not unduly suggestive, but rather affected the weight of the evidence, an

issue that properly could be argued to the jury.

A district court must assess whether a suggestive identification is reliable in light of the totality of the circumstances of the case. Biggers, 409 U.S. at 199; Emanuele, 51 F.3d at 1128. In evaluating the risk of misidentification, a district court should consider and weigh the following factors: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Manson, 432 U.S. at 114; Biggers, 409 U.S. at 199-200. These factors must be weighed and balanced against each other in making such a determination.[6]

The Court concludes that there is no need to exclude the out-of-court or to preclude the in-court identification of Mr. Sosa by Mr. Guzman. Neither Mr. Guzman nor Agent Stewart testified that there was any extensive discussion about Mr. Sosa prior to Mr. Guzman being given the photo notebook to review. Mr. Guzman reviewed each, and not just the first, photograph included in the book. There were almost 20 pictures in the book altogether. Although Mr. Sosa's counsel vigorously argued that Special Agent Stewart must have had an expectation that Mr. Guzman would identify Mr. Sosa as the person Mr. Guzman knew as "King Homicide," or

---

[6] For example, in United States v. Lawrence, 349 F.3d 109, 113 (3d Cir. 2003), the court found that a photo array in which the defendant's photo was the only one that was not a "mug shot" and the defendant was the only person not wearing a shirt and who was smiling was not impermissibly suggestive in light of the fact that the individuals in the array had "reasonably similar facial features and characteristics," that each of the identifying witnesses had an unobstructed opportunity to view the defendant without distraction, and both witnesses knew the defendant before the shooting. Thus, the Lawrence court found the likelihood of misidentification from undue suggestiveness to be remote. Id.

"Homi", the only way in which any such expectation would have been fulfilled was if the person depicted in the photograph was recognized by Mr. Guzman as that person. Mr. Guzman was clear in his testimony that no one suggested to him that Mr. Sosa was even pictured in the book much less suggest to him that the first person pictured in it was Mr. Sosa. Indeed, Mr. Guzman testified that he had become frustrated in not having seen any pictures of the fifth abductor and that immediately upon seeing the photo in question he was happy to have finally found a depiction of the fifth captor who had the gun. He recognized the picture of "Homi" immediately and without equivocation. Thus, given the circumstances here, the presentation of the photo book was neither unnecessarily suggestive nor was there a risk of erroneous identification.

Moreover, even if the presentation of the photo book was not the most pristine manner in which Mr. Sosa's photograph could have been recognized by Mr. Guzman, the factors outlined in Emanuele weigh against excluding this identification evidence. A conservative estimate of the time during which Mr. Guzman spent with Mr. Sosa is approximately six hours.[7] Moreover, at least 20 minutes of this time was spent answering questions posed by Mr. Sosa as he stood approximately 8 feet directly in front of Mr. Guzman. Their proximity would have been even closer during the alleged events regarding the placement of a gun into Mr. Guzman's mouth. Thus, it is clear that the chance for misidentification of Mr. Sosa is quite low. For these reasons the Motion will be denied.

---

[7] Mr. Sosa apparently was not present when Mr. Guzman was abducted, which was said to have occurred at approximately 2:00 in the morning. Allowing for a one-hour time frame within which Mr. Guzman and his abductors arrived in Philadelphia, based upon the other time-sequence information presented, Mr. Guzman spent from approximately 3:00 in the morning until approximately 9:00 in the morning with all five abductors, including Mr. Sosa, in close proximity in a well-lighted room.

**CONCLUSION**

Given these circumstances, Mr. Guzman is well able to identify his abductors and, therefore, there is no substantial risk of misidentification present. For these reasons, the Motion to Suppress the Out-of-Court and In-Court identification of Mr. Sosa by Rafael Guzman is denied. An appropriate Order follows.

/S/_____
Gene E.K. Pratter
United States District Judge

January 11, 2006

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **WILLIAM SOSA** | : | **No. 05-44-1** |

# O R D E R

**AND NOW,** this 11th day of January, 2006, upon consideration of the oral Motion to Suppress the out-of-court or in-court identification of Mr. Sosa by Rafael Guzman, the response thereto, and after a hearing on the Motion, it is **ORDERED** that the Motion is **DENIED**.

BY THE COURT:

/S/_____
GENE E.K. PRATTER
United States District Judge