**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **WILLIAM SOSA, ALEX** | : | |
| **MELENDEZ, ANGEL SERRANO,** | : | |
| **AND ELVIS ORTIZ** | : | **No. 05-44** |

Gene E.K. Pratter, J.          **Memorandum and Order**          June 15, 2006

Defendants William Sosa, Alex Melendez, Angel Serrano and Elvis Ortiz each move, pursuant to Federal Rule of Criminal Procedure 29, for acquittal on certain counts charged in the indictment.  Mr. Sosa also moves, alternatively, for a new trial.  For the reasons discussed below, the motions will be denied.

**I.      Factual Background**

The case from which these post-trial motions arise originally involved 17 defendants who were named on the same indictment dated January 26, 2005.  The indictment included 26 counts setting out charges of conspiracy to participate in the affairs of a racketeering enterprise through a pattern of murder, kidnaping, maiming, drug trafficking and robbery.  The alleged enterprise is called the "Philadelphia Lion Tribe," the local chapter of a purportedly criminal nationwide organization known as the Almighty Latin King and Queen Nation (the "ALKQN").

William Sosa was charged in 25 separate counts, including one count of conspiracy to participate in a racketeering enterprise ("RICO") (count 1), eight counts of conspiracy to commit murder in aid of racketeering (counts 2, 3, 5, 13, 15, 18, 21 and 24), six counts of using and carrying a firearm during a violent crime (counts 4, 6, 14, 16, 20 and 22), one count of conspiracy

1

to distribute heroin within 1000 feet of a public elementary school (count 7), one count of conspiracy to commit robbery and thereby affect commerce (count 8), three counts of kidnaping in aid of racketeering (counts 9, 11 and 17), two counts of conspiracy to maim in aid of racketeering (counts 12 and 23), two counts of conspiracy to commit kidnaping in aid of racketeering (counts 10 and 25) and one count of attempted murder in aid of racketeering (count 19).  Alex Melendez was charged in eight of the counts in the indictment, including conspiracy to participate in a RICO enterprise (count 1), conspiracy to distribute heroin within 1000 feet of a public elementary school (count 7), two counts of kidnaping in aid of racketeering (counts 9, 11), conspiracy to commit kidnaping in aid of racketeering (count 10), conspiracy to maim in aid of racketeering (count 12), conspiracy to commit murder in aid of racketeering (count 13), using and carrying a violent weapon during the commission of a violent crime (count 14).  Angel Serrano was charged in four counts of the indictment, including conspiracy to participate in a RICO enterprise (count 1), one count of conspiracy to commit murder in aid of racketeering (count 15), one count of using and carrying a firearm during a violent crime (count 16) and one count of kidnaping in aid of racketeering (count 17).  Elvis Ortiz was charged in 10 counts of the indictment, including conspiracy to participate in a RICO enterprise (count 1), one count of conspiracy to distribute heroin within 1000 feet of a public school (count 7), two counts of kidnaping in aid of racketeering (counts 9, 11), one count of conspiracy to commit kidnaping in aid of racketeering (count 10), one count of conspiracy to maim in aid of racketeering (count 12), two counts of conspiracy to commit murder in aid of racketeering (counts 13, 15), and two counts of using and carrying a firearm during a violent crime (counts 14, 16).

A 9-week jury trial began on January 10, 2006.  Two counts were eliminated from the

case before jury deliberations began: count 8 was dismissed by the Government at the close of its case-in-chief, and the Court granted a motion for acquittal with respect to count 23.   At the close of the Government's case, Mr. Sosa moved for acquittal with respect to counts 1, 2, 7, 9, 10, 11, 15, 16, 17, 22, 23, 24 and 25;[1] Mr. Melendez moved for acquittal with respect to counts 1, 7, 9, 10 and 13; Mr. Serrano moved for acquittal with respect to count 1, 15, 16, and 17; and Mr. Ortiz moved for acquittal with respect to counts 7, 9, 10, 11, 12 and 13.

In addition to granting the Rule 29 motion with respect to count 23, the Court denied the motion with respect to counts 2, 7, 11, 12, 15, 16, 22 and 24, and reserved judgment with respect to counts 1, 9, 10, 13, 17 and 25.  On March 15, 2006, the jury returned its verdict, finding William Sosa guilty on counts 3, 4, 5, 6, 7, 11, 12, 13, 14, 17, 18, 19 and 20,[2] Alex Melendez guilty on counts 1, 7, 11, 13 and 14,[3] Elvis Ortiz guilty on counts 1, 7, 11, 12, 13, and 14,[4] and Angel Serrano guilty on count 17.[5]  The jury was unable to reach a verdict with respect to counts

---

[1]  The transcript in this case reflects some discrepancies as to the counts on which Mr. Sosa actually moved for acquittal at the close of the Government's case.  Initially, counsel for Mr. Sosa indicated that he was moving pursuant to Rule 29 on counts 2, 8, 9, 10, 11, 15, 16, 17, 22, 23 and 24.  T.T. Feb. 23, 2006 at 253:12-13.  However, during initial oral argument on the motions, counsel for Mr. Sosa presented argument on additional counts – specifically, counts 7 and 25.   The Court considered the argument with respect to count 7 and denied the motion for acquittal.  See Docket No. 489.  Because Mr. Sosa was acquitted on count 25, no additional argument is necessary here.

[2]  The jury returned a verdict of not guilty with respect to Mr. Sosa on counts 2, 15, 16, 21, 22, 23, 24 and 25.

[3]  The jury returned a verdict of not guilty with respect to Mr. Melendez on count 12.

[4]  The jury returned a verdict of not guilty with respect to Mr. Ortiz on counts 15 and 16.

[5]  The jury returned a verdict of not guilty with respect to Mr. Serrano on counts 1, 15 and 16.

9 and 10 of the indictment, and the Court, upon the motion of the Government, dismissed those counts on April 19, 2006.  The motions presently before the Court seek acquittal on counts 3, 4, 6, 12, 13, 14, and 17 with respect to Mr. Sosa,[6] counts 1 and 13 with respect to Mr. Melendez, and count 17 with respect to Mr. Serrano.

A.      **Standard of Review**

Federal Rule of Criminal Procedure 29 allows a defendant to move for a judgment of acquittal either after the government concludes its presentation of evidence, after the close of all the evidence or within seven days after a guilty verdict or after the court discharges the jury, whichever is later.  FED. R. CRIM. P. 29(a), (c)(1).  Although a defendant is not required to move for a judgment of acquittal before the court submits the case to the jury, the procedural posture at the time such a motion is filed governs the evidence that a court may consider in deciding the motion. FED. R. CRIM. P. 29(c)(3);  United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005). That is, if a court reserved decision on a motion for acquittal filed before a case is submitted to the jury, the court must decide the motion on the basis of the evidence at the time the ruling was reserved.  FED. R. CRIM. P. 29(b).

In deciding a motion for judgment of acquittal, a court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilty beyond a reasonable doubt based on the available evidence." Brodie, 403 F.3d at 133 (quoting United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002)).  Only where the prosecution's failure is clear should such a motion be granted.  Id.  District courts are advised to

---

[6]  While in the present motion Mr. Sosa moves for acquittal only with respect to counts 3, 4, 6, 9, 10, 12, 14 and 17, as noted above, the Court had reserved judgment with respect to Mr. Sosa's earlier motion on  counts 1, 17 and 25.  Mr. Sosa was acquitted of count 25.

exercise care not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury.  Id.

**B.**     **Counts 3 and 4 - Conspiracy to Murder a Person Known as Julio Bristol and Alleged Use of a Firearm During the Commission of a Crime**

Counts 3 and 4 of the indictment relate to an alleged conspiracy to murder an individual who was perceived to have threatened a Latin Queen, Leyda-Rey Gonzalez.  William Sosa, alleged to have been the leader, or "Inca" or "First Crown," of the local Latin Kings, is the only defendant charged with these counts.  In count 3, the indictment specifically charges that Mr. Sosa, "for the purpose of maintaining and increasing his position in the [Latin Kings] enterprise . . . conspired and agreed with others known and unknown to the grand jury, to commit the knowing and intentional murder of a person whose identity is unknown to the grand jury, in violation of the laws of the Commonwealth of Pennsylvania."  Count 4 correspondingly charges that Mr. Sosa "knowingly used and carried, and aided and abetted the use and carrying of, firearms, that is handguns, during and in relation to a crime of violence for which he may be prosecuted in a Court of the United States."

The indictment lists three overt acts related to these counts of the indictment, including that "[o]n or about November 21, 2003, in Philadelphia (1) William Sosa . . . gave two firearms to two Latin Kings, one known and the other unknown to the grand jury, for the purpose of shooting and killing a person who was perceived to be a threat to Leyda Rey-Gonzalez, a/k/a 'Queen Heart,' a/k/a 'China'; (2) William Sosa ordered the murder of a person unknown to the grand jury unknown to the grand jury, in response to a perceived threat of violence against Leyda Rey-Gonzalez, a/k/a 'Queen Heart,' a/k/a 'China';" and (3) that two Latin Kings, "at the behest

of William Sosa . . . one known and the other unknown to the grand jury, shot and attempted to

kill the person who was perceived to be a threat to Leyda Rey-Gonzalez, a/k/a 'Queen Heart,'

a/k/a 'China,' near the corner of Luzerne and Fairhill Streets, in Philadelphia."

Mr. Sosa first argues that he is entitled to judgment of acquittal with respect to counts 3

and 4 because the indictment with respect to these counts was constructively amended by the

evidence presented by the Government at trial.  Mr. Sosa next argues that even if the indictment

was not amended, the variance between the evidence presented at trial and the allegations stated

on the indictment injected sufficient prejudice to warrant a new trial.  Further, during the oral

argument on this issue, Mr. Sosa's counsel asserted that there are two sets of "facts" from which

the Court might find either a constructive amendment or variance: those involving the

delineation of Leyda Rey-Gonzalez as the Latin Queen perceived to have been threatened, and/or

the mistaken identity of the unknown attempted murder victim as Julio Bristol.  May 19 Tr. at

98:5-7.

### 1.    Constructive Amendment of Indictment

The protections afforded by the Fifth and Sixth Amendments[7] require that an indictment

contain the essential elements of the offense (or offenses) charged.  United States v. Schramm,

75 F.3d 156, 163 (3d Cir. 1996).  In cases involving conspiracy charges, the illegal object of the

conspiracy is an essential element of the offense and must be included in the indictment.

---

[7] The nature of these protections is three-fold.  United States v. Schramm, 75 F.3d 156, 163 (3d Cir. 1996).  First, Sixth Amendment protection requires an indictment to be "sufficiently precise" to inform a defendant of the charges against which he or she must defend.  Id.  Fifth Amendment protections likewise require (1) that an indictment enable a defendant to determine whether he or she has been acquitted or convicted of the same crime previously, and (2) that a defendant be required to defend only those allegations returned by an independent grand jury, thereby protecting the defendant from unfounded prosecutorial charges.  Id.

Schramm, 75 F.3d at 163.[8]  Although minor or technical deficiencies in an indictment may be ignored, an indictment that fails to specify the object of a conspiratorial agreement would not be considered to suffer only a minor or technical deficiency.  Id.

An indictment will be considered to have been improperly amended where the evidence presented at trial does not correspond to the information set forth in the indictment.  See United States v. Lee, 359 F.3d 194, 208 (3d Cir. 2004) ("[w]here trial evidence [has] amended the indictment by *broadening* the possible bases for conviction from that which appeared in the indictment, the variance violates the defendant's substantial right to be tried only on charges returned by a grand jury") (emphasis in original); but see also United States v. Crocker, 568 F.2d 1049, 1059 (3d Cir. 1977) (finding that a variance between facts alleged in indictment and evidence offered at trial presents problem of promoting fairness of trial and notice of opportunity to be heard, rather than that of usurping role of grand jury).

With respect to the target of the perceived threat here, Mr. Sosa argues that "[t]he removal of a threat to Leyda Rey-Gonzalez is the purpose or object or goal . . . of this conspiracy," and that by proving that the purpose of the conspiracy was to "remove a threat to someone else," i.e., not Ms. Rey-Gonzalez, the Government constructively amended the

---

[8]  Under Pennsylvania law, the elements of conspiracy to commit murder include (1) that the defendant agreed with another person or group of persons that they or one or more of them would engage in the conduct which constitutes murder, or an attempt to murder, or solicitation to commit murder, or that the defendant agreed to aid such other person or group of persons in the planning or commission of the murder or attempt or solicitation to commit murder; and (2) that the defendant did so with the intent of promoting or facilitating the commission of the crime of murder. 18 Pa. C.S.A. § 903.

indictment.  May 19 Tr. at 98:9-12.[9]  Mr. Sosa, by way of supplemental filings after the oral

argument on these Motions, also urges that the Court read the indictment as a whole.  Mr. Sosa

contends that the reference to Ms. Rey-Gonzalez must be considered when these counts are

reviewed.

      While the Government acknowledges that the actual target of the threat perceived by Mr.

Sosa and the ALKQN was not Leyda Rey-Gonzalez, it argues that this difference is not relevant.

The Government also argues that Mr. Sosa's citation to various overt acts referenced in the

indictment is of no moment because those overt acts do not constitute the charging language of

counts 3 and 4 and need not be proved at all.[10]

      Review of the case law and the facts and circumstances presented in this case persuades

the Court that here no amendment of the indictment is, as Mr. Sosa suggests, apparent.  First,

---

[9]  In support of this argument, Mr. Sosa cites Howard v. Daggett, 526 F.2d 1388, 1389
(9th Cir. 1976), a case which involved charges that the defendant induced two women, who were
specifically named in the indictment, to engage in prostitution.  At trial, evidence of the
defendant's relationships with other women was presented and, when the jury was instructed as
to the law, the court did not specifically identify the women named in the indictment.  Id.  The
jury became confused and sent a note to the court, and the further instructions given permitted
the jury to conclude that it could convict the defendant based upon the defendant's relationships
with women other than those named in the indictment.  Id.  The Howard court found the
instructions constituted an impermissible amendment of the indictment, noting that "[t]he grand
jury might have indicted appellant in a general allegation, without specifying the women to
whom his alleged illegal acts or purposes related, [b]ut it did not do so."  Id. at 1390.  Mr. Sosa
argues that as in Howard, the specific indication in the indictment to "Leyda Rey-Gonzalez," or
"China," as the target of a threat should have confined the Government to presenting evidence
only related to threats made against Ms. Rey-Gonzalez, and that evidence of any other person
referred to as "China" impermissibly amended the indictment.

[10]  A factual discrepancy contained in an overt act as stated in an indictment does not
amount to a constructive amendment of the indictment.  See United States v. Adamo, 534 F.2d
31, 39 (3d Cir. 1976) ("a variance [between an overt act in furtherance of a conspiracy] does not
amount to an amendment of the indictment to alter an element of the alleged crime . . . .").

with respect to Mr. Julio Bristol (the putative victim of the criminal activity), the Court notes that

Mr. Bristol was never identified in the indictment as the intended victim of the murder

conspiracy.  In fact, the indictment clearly states that the identity of the potential victim was

unknown to the grand jury.  Thus, the introduction of Mr. Bristol's name during the pretrial

discovery period or during the  trial could not have served to amend the indictment.

      More significantly, and turning to the issue involving Leyda Rey-Gonzalez, Mr. Sosa

repeatedly ignores, confuses or obfuscates the fact that Ms. Rey-Gonzalez was not the *target of

the illegal act* relating to the conspiracy.  That is, the target of the illegal action, namely the

proposed  murder, was, according to the indictment, "a person unknown to the grand jury" who

was later named as a person identifying himself as "Julio Bristol."  Ms. Rey-Gonzalez was

identified in the indictment as a person whom Mr. Sosa *perceived* to be threatened by the

unidentified individual who, as a result of this perception, became the target of the murder

conspiracy.

      In short, based on the evidence presented, a reasonable juror could conclude that the

Government proved beyond a reasonable doubt that Mr. Sosa conspired to have an unknown

person who was perceived to have threatened Ms. Rey-Gonzalez murdered.  The fact that Mr.

Sosa might have been incorrect with respect to his understanding as to which "Queen China" had

been threatened is not relevant, because the perceived target of the threat was not the target of the

conspiracy, but rather was the, albeit incorrect, motivation for it.  Thus, the suggestion that Mr.

Sosa might not have ordered the murder of the threat-maker if he had known that it was not Ms.

Rey-Gonzalez who had been threatened is not relevant because that proposition goes only to Mr.

Sosa's motivation to conspire to murder, and is not an actual element of the crime that was

charged.  There is no requirement in the law that one must be correct about all of the reasons for

undertaking criminal activity; taking aim at "Sam", believing him to be "Bill" would be no less a

crime than would have been having "Bill" correctly in the gun sights.  Because there is sufficient

evidence from which a reasonable jury could conclude that Mr. Sosa, based on his understanding

that Ms. Rey-Gonzalez had been threatened, conspired to murder an unknown person, there was

no constructive amendment of the indictment and, as such, no basis to enter a judgment of

acquittal or to grant a new trial with respect to counts 3 and 4.

2.     <b>Fatal Variance Between Indictment and Evidence</b>

Mr. Sosa next argues that even if counts 3 and 4 of the indictment were not constructively

amended, there was "a fatal variance between Counts 3 and 4 of the indictment and the

governments (sic) evidence at trial pertaining to these counts."  <u>Memorandum of W. Sosa</u> at 11.

With respect to the reference to Mr. Bristol, Mr. Sosa specifically asserts that the notice given in

the indictment, as supplemented by discovery provided by the Government prior to trial, "clearly

and unequivocally" led him to believe that at trial the Government would offer proof that the

purpose or object of the conspiracy alleged in count 3, as well as the use of a firearm alleged in

count 4, was to murder Julio Bristol,[11] and that by later identifying the intended victim of the

_____

[11]  With respect to the discovery related to Mr. Bristol, Mr. Sosa argues that by providing
him a one page police report that described the shooting of "an individual identified as Julio
Bristol," the Government put him on notice that the person who had made the alleged threat
against Ms. Rey-Gonzalez was Julio Bristol.  <u>Memorandum of W. Sosa</u> at 8.  This, Mr. Sosa
repeatedly states, caused him to spend wasted time tracking down Ms. Rey-Gonzalez and Mr.
Bristol, only to find out on the 13th day of the trial that there was another woman with the Latin
Queen name "China" and, ultimately, that Julio Bristol was not the person who had been shot,
but that the actual shooting victim had simply given this Bristol name to the police investigating
the shooting.  <u>Memorandum of W. Sosa</u> at 7-8.  There is no basis in this case – and no serious
argument by the defendants – that the Government's transmittal of Julio Bristol's name to
defense counsel during pretrial activities in this case was other than in keeping with good faith

murder to be Julio Bristol, there was a fatal variance between the language of the indictment and the evidence presented at trial. <u>Id</u>. at 7.

Although the line is, at times, difficult to draw, there is a distinction between the constructive amendment of an indictment and a variance between the allegations charged in the indictment and the facts proven at trial. <u>United States v. Daraio</u>, 445 F.3d 253 (3d Cir. 2006). A variance occurs "where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." <u>Id</u>. The constitutional concerns raised by a variance argument differ from those raised by constructive amendment of an indictment in that where a variance is found, a court must consider not whether the role of the grand jury has been usurped, but rather whether a defendant received a fair trial and was given sufficient notice of the charges against him. <u>Id</u>.

While constructive amendment of an indictment constitutes reversible error, the existence of a variance requires reversal only if it is likely to have surprised or otherwise served to prejudice the defense. <u>Id</u>. at * 7. To demonstrate that a variance has resulted in prejudice, a defendant must show that (1) there was a variance between the indictment and the proof adduced at trial; and (2) the variance prejudiced some substantial right. <u>Id</u>. (citing <u>United States v. Balter</u>, 91 F.3d 427, 441 (3d Cir. 1985)). No prejudice of a substantial right will be found if (1) the indictment sufficiently informs the defendant of the charges against him so that he may be prepared for trial and will not suffer from surprise at trial or (2) the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense.

---

performance of the discovery obligations imposed upon or otherwise undertaken by the Government.

Id.  (citing United States v. Schoenhut, 576 F.2d 1010, 1021-22 (3d Cir. 1978)).

Mr. Sosa argues that he suffered substantial prejudice from a variance between the charges stated in the indictment and the evidence presented at trial because counts 3 and 4 in the indictment did not sufficiently inform him of the charges against him and prevented him from presenting a defense at trial.  Memorandum of W. Sosa at 12.  Mr. Sosa points out that while the indictment states that Leyda Rey-Gonzalez was the object of a threat and that through the discovery process he was led to believe that Julio Bristol was the person who threatened Ms. Rey-Gonzalez, the evidence at trial allowed the jury to consider a different set of facts – that the indictment and the facts allow for finding that Mr. Sosa could have conspired to murder the person who posed a threat to Leyda Rey-Gonzalez, as the indictment alleges, *and* that Mr. Sosa could also have conspired to murder a completely different person who posed a threat to "Queen China," as was alleged at trial.  This variance, Mr. Sosa argues, is fatally prejudicial and warrants either acquittal on these counts or, in the alternative, a new trial.[12]

---

[12]  In support of his variance argument, Mr. Sosa cites to two cases.  In United States v. Robles-Vertiz, 155 F.3d 725, 728 (5th Cir. 1998), the defendant argued that the indictment charging him with smuggling illegal aliens into the country was amended because while the indictment named the alleged illegal alien as Monica Ramirez-Sanchez, the evidence at trial demonstrated that he had transported a woman named Monica Martinez-Salazar.  In finding that the indictment was not constructively amended, the court likened the error in the indictment to a spelling error.  After noting that the error could have caused the defendant no confusion or prejudice, the court concluded in language equally germane here that "[t]he change in name did not reflect a change in the alleged conduct."  Robles-Vertiz, 155 F.3d at 729.  In so concluding, the court noted that had Ms. Ramirez-Sanchez been an additional person involved in the smuggling scheme, the ruling would have been different because then, the indictment would have been improperly broadened to include an additional person.

In United States v. Adamson, 291 F.3d 606, 609 (9th Cir. 2002), the defendant was charged on the indictment with misrepresenting to a software company that certain computers had not been upgraded for the purpose of obtaining certain software licenses.  At trial, the evidence presented did not prove that the defendant had misrepresented information about the

To determine whether there was a fatal variance between the indictment and the evidence presented at this trial, the Court must consider whether the facts proved at trial differed in a material way from those alleged in the indictment.  Here, the indictment alleged that Leyda Rey-Gonzalez was the *perceived* target of a threat by a person unknown to the grand jury and that, in response to this perceived threat, Mr. Sosa conspired to murder an unknown person.  The evidence presented at trial established that the perceived threat against Ms. Rey-Gonzalez was, essentially, a case of mistaken identity.  A. Charriez, T.T., Jan. 30, 2006 at 49:17-25. Additionally, the evidence established that although the victim of the attempted murder gave the name of Julio Bristol to the police, the person whose name is, in fact, Julio Bristol, was not the victim of the attempted murder.  J. Bristol, T.T. Feb. 28, 2006 at 7:1-13.

These facts are not materially different from those alleged in the indictment.  Although Mr. Sosa argues that the facts presented in court allowed for the jury to find him guilty of conspiring to murder a person perceived to pose a threat to someone *other than* Ms. Rey-Gonzalez, Mr. Sosa fails to note that Ms. Rey-Gonzalez was not the *target* of the attempted murder, but was rather the *motivation* for the intended murder.  Regardless of whether Mr. Sosa was motivated to avenge a threat posed to Ms. Rey-Gonzalez or another person, the evidence

---

upgrade, but rather that the misrepresentation involved the way in which the servers had been upgraded.  Id. at 610-11.  The defendant argued that the variance resulted in substantial prejudice, in that it allowed him to be convicted on evidence of a misrepresentation that differed from that alleged in the indictment.  The Adamson court found that there was no constructive amendment of the indictment because the divergence between the types of misrepresentation did not alter the crime charged in such a way that it was not possible to know whether the grand jury would have indicted the defendant on the charge presented at trial.  Id. at 616.  However, the court did find that the variance between the indictment and the evidence presented was fatal because the defendant had not been properly informed of the charges against him and consequently was prejudiced with respect to defending himself.  Id.

presented aligned with the indictment in allowing the jury to find that Mr. Sosa intended to murder a person he believed posed a threat. Mr. Sosa's error does not turn criminal conduct into non-criminal conduct. Stated differently, the important "error" was what Mr. Sosa did, not why he did it. Therefore, the Court finds that there was no fatal variance requiring reversal or the granting of a new trial.[13] As such, Mr. Sosa's motion with respect to counts 3 and 4 of the indictment will be denied.

C.      **Count 6 - Using and Carrying a Firearm During a Violent Crime**

Count 6 of the indictment charges that on or about September 8, 2003, Mr. Sosa "knowingly used and carried, and *aided and abetted* the use and carrying of firearms, that is, a handgun and a shotgun, during and in relation to a crime of violence[14] for which they may be prosecuted in a court of the United States, that is, conspiracy to commit murder in aid of racketeering" in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and (2). (emphasis added).

Section 924(c) provides in relevant part that "any person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime,

---

[13] Mr. Sosa additionally included argument with respect to the nature and relationship of counts 3 and 4 of the indictment. Mr. Sosa specifically argues that should his motion with respect to count 3 be granted, the motion would necessarily have to be granted with respect to count 4 because the allegations charged in count 4 are predicated on the crime charged in count 3. Memorandum of W. Sosa at 14-15. This argument was premised on the presumption that the Government would attempt to "salvage" count 4 by arguing that any variance in count 3 would have no effect on count 4. The Government did not make this argument, and, in any case, given the Court's ruling as to count 3, there is no need to address this anticipatory argument.

[14] The crime of violence corresponding to this charge is stated in count 5 of the indictment, which charged Mr. Sosa with conspiring "to commit the knowing and intentional murder of a person whose identity is unknown to the grand jury, in violation of the laws of the Commonwealth of Pennsylvania." Mr. Sosa was convicted of this charge.

possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime [be sentenced to additional punishment]."  18 U.S.C. § 924(c).  Section 924(c) has been interpreted to have three alternative prongs: a "use" prong, a "carry" prong and a "possession" prong.  United States v. Williams, 244 F.3d 365, 370 (3d Cir. 2003).

Mr. Sosa argues that he is entitled to a judgment of acquittal on count 6 for two reasons. This count concerned the charge that Mr. Sosa directed Latin Kings to travel to Trenton to engage a competing Latin King gang in an altercation and to take weapons with them.  First, Mr. Sosa argues that because "no juror could have found beyond a reasonable doubt that a firearm was *used or carried* during and in relation to the conspiracy to commit [the] murder alleged," he must be acquitted.  Memorandum of W. Sosa at 16.  Mr. Sosa also argues that the evidence produced at trial was not sufficient to find him guilty of carrying a firearm as a principal, aider or abettor or under the Pinkerton theory.[15]

1.    **Using a Weapon in Furtherance of a Crime of Violence**

Mr. Sosa rests this first argument primarily on Bailey v. United States, 516 U.S. 137 (1995).  In Bailey, two defendants were separately convicted for the use of a firearm during and in relation to a drug-trafficking crime.  Bailey, 516 U.S. at 138-39.  On appeal, the Court was asked to determine "whether evidence of the proximity and accessibility of a firearm to drugs or

---

[15]  In Pinkerton v. United States, 328 U.S. 640, the Supreme Court held that the criminal act of one conspirator in furtherance of the conspiracy is "attributable to the other [conspirators] for the purpose of holding them responsible for the substantive offense."  Pinkerton at 647.  The Pinkerton theory allows the government to prove the guilt of one defendant through the acts of another committed within the scope and in furtherance of a conspiracy of which a defendant was a member.  United States v. Lopez, 271 F.3d 472, 480 (3d Cir. 2001).  This theory of guilt is discussed separately below.

drug proceeds is alone sufficient to support a conviction for "use" of a firearm during and in relation to a drug trafficking offense under 18 U.S.C. § 924(c)(1)."  Id. at 138-39.  In reversing the convictions, the Court held that the "'use' of a firearm must connote more than mere possession of a firearm by a person who commits a drug offense." Id.  at 143.

In response, the Government argues that Mr. Sosa's reliance on Bailey is mistaken because the Bailey opinion focused only on the "use" prong of the statute while this present case is grounded upon the "carrying" prong.  The Court agrees.  In this case, there was no evidence presented that the shotgun in question was actually used in relation to the crime alleged in count 5 of the indictment.  Thus, the Court must necessarily focus on whether the gun was carried in relation to the commission of the conspiracy to commit murder in aid of racketeering.

### 2.    Carrying a Weapon in Furtherance of a Crime of Violence

The Court must next consider whether the evidence was such that a reasonable jury could have concluded that there was "carrying" of a weapon in furtherance of the crime charged in count 5.  The Court of Appeals for the Third Circuit advises that in order to be carried "in relation to" a particular offense, the presence of the gun in question cannot be "the result of accident or coincidence," and that "the gun must have had 'some purpose or effect' as to, and must have at least 'facilitate[d], or [had] the potential of facilitating,' the underlying offense." Williams, 344 F.3d at 371 (quoting Smith v. United States, 508 U.S. 223, 238 (1993)).  Mr. Sosa argues that, according to the trial testimony, the shotgun in question with respect to this count was hidden in the back of a truck where it was eventually found by the Trenton police. Memorandum of W. Sosa at 19.  Mr. Sosa further argues that Mr. Charriez (a witness cooperating with the prosecution) testified that he purposefully and successfully hid the shotgun

16

and that it would not have been possible to murder anyone in Trenton because the Latin Kings who arrived there did not possess any weapons.  Thus, Mr. Sosa argues that the requirement that the weapon was carried in furtherance of the conspiracy to commit murder remains unmet because the weapon was abandoned by Mr. Charriez before the conspirators reached their ultimate destination.  <u>May 19 Tr.</u> at 95:11-16.

In response, the Government argues that there is sufficient evidence from which a reasonable juror could conclude that Mr. Sosa was responsible for carrying a weapon in relation to the conspiracy to murder charged in count 5.  The Government specifically contends that the conspiracy that began in Philadelphia included the retrieval and transport of the shotgun, which was then hidden for later retrieval by Mr. Charriez or others, and that the only reason that the gun was not used was because the Trenton police intervened before any confrontation could occur.  <u>May 19 Tr.</u> at 146:1-18; <u>see also</u> <u>A. Charriez, T.T. Jan. 30, 2006</u> at 72:9; 74:1-11; 76:19-20; <u>J. Wallenberg, T.T. Feb. 10, 2006</u> at 119:1-10.  Thus, the Government contends that the gun was carried in relation to the conspiracy to murder.

The Court concludes that there is sufficient evidence in the record from which a reasonable jury could find beyond a reasonable doubt that there was a weapon carried in furtherance of the crime that was charged, namely, conspiracy to murder.  The record evidence, through the testimony of Joseph Wallenberg and Alberto Charriez, shows that Mr. Sosa instructed Philadelphia Latin King chapter members to meet and travel to Trenton for the purpose of murdering individuals, that Mr. Sosa intended for guns to be brought along for the trip, and that he intended that the guns be used  <u>J. Wallenberg, T.T. Feb. 10, 2006</u> at 115:14-16, 21-25; 116:1-3; 25; 117:1-2;  <u>A. Charriez, T.T. Jan. 30, 2006</u> at 72:17-18; 74:6-7; 79:16-17.

Under Pennsylvania law, a conspiracy may be found where (1) a defendant intended to commit or aid in the commission of a criminal act and (2) entered into an agreement with another to engage in a crime, and (3) that the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. Commonwealth v. Little, 879 A.2d 293, 298 (Pa. Super. Ct. 2005). In this case, although there was testimony that the gun was placed in the back of a truck and that it was not in the actual immediate physical possession of the Latin Kings at the time they entered the home in Trenton, the actual conspiracy could have reasonably been found to have formed at the moment that the conspirators gathered and agreed to travel to Trenton to commit a crime, and then picked up the gun and transported it to Trenton. See, e.g., A. Charriez, T.T. Jan. 30, 2006 at 76:13-20; 79:19-20; E. Vasquez, T.T. Feb. 16, 2006 at 64:11. Thus, a reasonable jury could conclude, beyond a reasonable doubt, that a gun was carried in furtherance of the conspiracy to commit murder charged in count 5 of the indictment.

> 3.    **Insufficient Evidence Under Pinkerton - Co-conspirator Liability**

Finally, although the Pinkerton aspect of Mr. Sosa's argument was not directly addressed at oral argument on the motion, the Court further concludes that this argument, presented in Mr. Sosa's motion papers, likewise cannot prevail. This conclusion is supported by United States v. Casiano, 113 F.3d 420 (3d Cir.) cert. denied, 522 U.S. 887 (1997). In Casiano, the defendant was one of three individuals who carjacked, kidnaped, beat and shot a priest before abandoning him in an isolated place. Each of the defendants was convicted of conspiracy to commit carjacking and kidnaping and carjacking and using a firearm in relation to a crime of violence pursuant to Section 924(c)(1). Casiano, 113 F.3d at 424. Citing to Bailey, Mr. Casiano, who had not participated directly in the beating or shooting, challenged his conviction under Section

18

924(c)(1), arguing that it was his co-conspirators, and not he, who had carried and used the gun involved.  <u>Casiano</u>, 113 F.3d at 427.  Affirming the conviction, the court of appeals stated that "[a]s long as [a conspirator's] action was within the purview of the conspiracy, his co-conspirators are liable for his gun as if they had carried the firearm themselves."  <u>Id</u>.  The court went on to note that "the rule of co-conspirator liability is unaffected" by <u>Bailey</u>, which focused on the type of "use" of a firearm rather than the person responsible for carrying it.  <u>Id</u>.

Although <u>Casiano</u> is not identical to this case now before the Court, it is useful for purposes of examining the present circumstances and evidence.  Additionally, the Court of Appeals for the Third Circuit has recently reiterated that "a defendant can be convicted of aiding and abetting a violation of § 924(c)(1) without ever possessing or controlling a weapon if the defendant's actions were sufficiently 'intertwined with, and his criminal objectives furthered by' the actions of the participant who did carry and use the firearm."  <u>United States v. Gordon</u>, 290 F.3d 539, 547 (3d Cir. 2002).  Thus, as long as Mr. Charriez's action in placing the gun in the truck so that it could later be retrieved would have been reasonably foreseeable by Mr. Sosa, acquittal on this count would not be appropriate, as long as the Court finds that the gun had the potential to facilitate the crime, as discussed above.  For these reasons, Mr. Sosa's motion for acquittal with respect to count 6 of the indictment will be denied.

## D.     Count 12 - Conspiracy to Maim Raphael Guzman in Aid of Racketeering Activity

Count 12 of the indictment charges that on or about December 22, 2203 until on or about December 24, 2003, Mr. Sosa "conspired and agreed with [several co-conspirators], and with others known and unknown to the grand jury, to maim a person known to the grand jury as LK-

4,[16] by cutting off his hands, in violation of the laws of the Commonwealth of Pennsylvania."

Mr. Sosa argues that he is entitled to acquittal on count 12 because the evidence was insufficient for a reasonable jury to conclude, beyond a reasonable doubt, that (1) there was any agreement or meeting of the minds between Mr. Sosa and anyone else in order to form a conspiracy to maim Mr. Guzman and (2) there was any overt act taken in furtherance of the alleged conspiracy.  May 19 Tr. at 72:6-9.  Mr. Sosa specifically argues that aside from the testimony of Mr. Guzman that he (Mr. Guzman) had heard earlier in the evening in question Mr. Rosado (one of the co-defendants named in the indictment) state that he (Mr. Rosado) wanted to cut off Mr. Guzman's hands, the only other evidence regarding this conspiracy to maim was the testimony of Aaron Martinez.  May 19 Tr. at 75:2-11; 76:20-22.  Mr. Martinez testified that Mr. Sosa ordered some Latin Kings to locate a machete for the purpose of cutting off Mr. Guzman's hands after the beating of Mr. Guzman had ended, and, because the statement of Mr. Rosado was made earlier in the evening, the two comments could not reasonably be linked to establish the existence of an agreement to maim, according to the defendants.  May 19 Tr. at 75:5-7.

In response, the Government argues from the trial record that the existence of an agreement and an overt act in furtherance of that agreement were evidenced not only by the order of Mr. Sosa to his lieutenants to go out and obtain a machete for the purpose of cutting off Mr. Guzman's hands, but also by the fact that Mr. Ortiz was ordered to guard Mr. Sosa at gunpoint while the others set about locating a machete and, in fact, Mr. Ortiz undertook to perform this task.  May 19 Tr. at 144:11-17.

Under Pennsylvania law, to find a defendant guilty of conspiracy to commit aggravated

---

[16]  At trial, LK-4 was identified as Raphael Guzman.

assault,[17] the evidence must demonstrate beyond a reasonable doubt that (1) the defendant agreed

with another person or group of persons that they or one or more of them would engage in the

conduct which constitutes aggravated assault, or of an attempt to commit aggravated assault or

solicitation to commit aggravated assault, or that the defendant agreed to aid such other persons

or group of persons in the planning or commission of the aggravated assault or attempt or

solicitation to commit aggravated assault; and (2) the defendant did so with the intent of

promoting or facilitating the commission of the crime of aggravated assault.  18 Pa. C.S. §§ 903,

2702.

       The agreement made between co-conspirators constitutes the essence of a criminal

conspiracy.  Commonwealth v. Little, 879 A.2d 293, 298 (Pa. Super. Ct. 2005).  In a conspiracy

case, a defendant's intent to commit a crime, as well as the corresponding agreement, is often

proven by circumstantial evidence, such as "the relations, conduct or circumstances of the parties

or overt acts on the part of the co-conspirators."  Id.  As long as a co-conspirator has knowledge

of the conspiracy's illicit purpose when acts in furtherance of that purpose are performed, it can

reasonably be inferred that a party who associates himself with an ongoing conspiracy has

achieved a tacit agreement with members of the ongoing conspiracy.  United States v. Klein, 515

F.2d 751, 753 (3d Cir. 1975); see also United States v. Perez, 144 F.3d 204, 208 (2d Cir. 1998)

("[t]he conspirators need not have agreed on the details of the conspiracy, so long as they have

agreed on the essential nature of the plan").

       The record evidence suggests that a reasonable juror could have found, beyond a

reasonable doubt, an agreement and an overt act supporting the conspiracy to maim Mr. Guzman.

---

       [17]  The crime of "maiming" is titled "aggravated assault" under Pennsylvania law.

Mr. Sosa acknowledges the testimony of Aaron Martinez that after Mr. Guzman had been beaten, Mr. Sosa directed that his co-conspirators to secure a machete so that Mr. Guzman's hands could be severed.  A. Martinez, T.T. Feb. 3, 2006 at 108:11-25.  Although Mr. Sosa argues that this command was nothing more than an order to which there was no consent or obedience, he ignores the fact that this "command" was made in the midst of an ongoing conspiracy to kidnap and brutally beat Mr. Guzman.  Mr. Sosa additionally ignores the fact that although Mr. Martinez did not actually acquire the requested machete, Mr. Martinez did leave the house to obtain it upon the command of Mr. Sosa.  A. Martinez, T.T. Feb. 3, 2006 at 110:3-5.  Based on this evidence, a reasonable jury could have found from the evidence of the conduct recounted, beyond a reasonable doubt, that there was an agreement and a sufficient overt act in furtherance of the conspiracy to maim Mr. Guzman.  For these reasons, Mr. Sosa's motion for acquittal with respect to count 12 will be denied.

        E.        **Count 14 - Using and Carrying a Firearm During a Violent Crime During the Conspiracy to Murder Raphael Guzman**

Count 14 of the indictment charges that Mr. Sosa "knowingly used and carried, and aided and abetted the use and carrying of, firearms, that is, handguns, during and in relation to a crime of violence for which they may be prosecuted . . . that is, conspiracy to commit murder in aid of racketeering."  This count also concerned the crimes directed against Mr. Guzman.  Mr. Sosa argues that he is entitled to acquittal with respect to this count because even if there was a conspiracy to murder Mr. Guzman, there was no evidence presented at trial that any firearm was ever used or carried during the commission of that conspiracy.  Memorandum of W. Sosa at 22.

In response, the Government argues that "there was abundant testimony that [Mr. Sosa

and his co-conspirators] evinced an intent to murder [Mr.] Guzman," and that there was also "an abundance of evidence that firearms were used in the course of this murder conspiracy." Government Omnibus Response Memorandum at 6.  The Government further notes the testimony that Alex Melendez presented a firearm when Mr. Guzman was taken from his home, and that later in the confrontation Mr. Sosa not only pointed the firearm at Mr. Guzman, but also jammed the weapon into Mr. Guzman's mouth and used it to "pistol whip" him.  Id.

With respect to this count, Mr. Sosa focuses on the fact that count 14 of the indictment charges that he used or carried a weapon only in relation to *the conspiracy to murder Mr. Guzman*, and does not list the kidnaping, conspiracy to commit kidnaping or conspiracy to maim counts as crimes of violence for which the use and carrying of firearms was initiated.  May 19 Tr. at 84:24-25; 85:1-6.  Thus, Mr. Sosa argues that the earliest point in time that the conspiracy to murder Mr. Guzman could have arisen was after he had been removed from his home, driven to Philadelphia, severely beaten and kept under guard.  Based on these distinctions, Mr. Sosa argues that because there was no testimony that guns were taken on the search for Mr. Guzman after he escaped from the residence on Mutter Street, the jury could not have found that guns were used or carried to further the conspiracy to murder Mr. Guzman.  May 19 Tr. at 85:11-19; 87:11-14.

A close reading of count 13 of the indictment, a count on which Mr. Sosa was convicted, suggests that Mr. Sosa reads the count in question here too narrowly.  Count 13 of the indictment states that "[f]rom *on or about December 22, 2003 to in or about January 2004*, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, for the purpose of maintaining and increasing their positions in the enterprise," Mr. Sosa and other defendants conspired to "commit the knowing and intentional murder of a person known to the grand jury as LK-4." (emphasis

added).  Thus, the conspiracy to commit murder charged by the grand jury encompassed the time from which Mr. Guzman was abducted from his home through the time after which he escaped and a "terminate on site" order was placed against him by Mr. Sosa.

Therefore, it would be simply too strained to accept Mr. Sosa's argument that the evidence at trial does not support a reasonable person concluding that a gun was used in relation to this count of the indictment.  As the Government pointed out, during the trip from New Jersey to Philadelphia, Mr. Melendez repeatedly threatened to harm Mr. Guzman with the gun that Mr. Melendez was carrying.  See R. Guzman, T.T. Jan. 31, 2006 at 138:10-13; 139:17; 140:1-2. Additionally, the gun was used in at least two menacing manners during the beating Mr. Guzman received in the basement at the house on Mutter Street.  R. Guzman, T.T. Jan. 31, 2006 at 144:7-9, 13-15; 149:22-25; 150:1-25.  Considering the scope of this charge in the indictment in conjunction with the testimony on the record, there is sufficient evidence from which a jury could conclude that a gun was used or carried in furtherance of the commission of the crime charged in count 13.  Therefore, Mr. Sosa's motion for acquittal with respect to this count will be denied.

F.    **Count 17 - Alleged Kidnaping of Elena Mercado in Aid of Racketeering**

Count 17 of the indictment charges that from on or about March 18, 2004 to on or about April 5, 2004, William Sosa, Angel Serrano and other co-defendants "together, and with others known and unknown to the grand jury, knowingly and unlawfully kidnaped a person known to the grand jury as LQ-2,[18] and aided and abetted the kidnaping of LQ-2, by removing LQ-2 a substantial distance, and confining LQ-2 for a substantial period of time, with the intent to facilitate the commission of another felony, that is, aggravated assault and rape, and to inflict

_____

[18]  At trial, LQ-2 was identified as Elena Mercado.

24

bodily injury upon and terrorize LQ-2, in violation of the laws of the Commonwealth of Pennsylvania." Messrs. Sosa and Serrano each argue that they are entitled to acquittal with respect to this count of the indictment because there was not sufficient evidence from which a reasonable juror could conclude, beyond a reasonable doubt, that Ms. Mercado was removed from her home against her will or was subsequently detained against her will.

Under Pennsylvania law, a person is guilty of kidnaping if "he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with the intent to . . . facilitate commission of any felony [or] . . . to inflict bodily injury on or to terrorize the victim of another." 18 Pa. C.S.A. § 2901(a). Where confinement is the basis of the charge, such confinement must be for "a substantial period" lest the kidnaping statute be erroneously applied to detentions that are "merely incidental" to other crimes. Commonwealth v. Hook, 512 A.2d 718, 719 (Pa. Super. Ct. 1986).

### 1. Unlawful/Coerced removal

Messrs. Sosa and Serrano first argue that because Ms. Mercado voluntarily came to Philadelphia and refused assistance from the FBI when agents arrived on the premises where Ms. Mercado was then located with other Latin Kings and Queens to inquire as to her welfare, there is no basis from which a reasonable juror could have found, beyond a reasonable doubt, that Ms. Mercado was either removed or confined against her will.

Unless a person is deceived or threatened, evidence of a party's consent to accompany an abductor may refute a kidnaping allegation. See, e.g., Commonwealth v. Malloy, 856 A.2d 767 (Pa. 2004) (finding that victim who volunteered to accompany group of people who murdered

him did not consent because later, after having dispute with others, he was forced at gunpoint to

get into car);[19] Commonwealth v. Begley, 780 A.2d 605, 620 (Pa. 2001) (finding kidnaping

charge appropriate where victim was lured from home based on deception); Commonwealth v.

Aulisio, 522 A.2d 1075, 1079 (Pa. 1987) (finding that mother's implied consent to allow children

to accompany neighbor into home was sufficient to defeat kidnaping charge after children were

later found murdered in closet of neighbor's home); see also United States v. Chancey, 715 F.2d

543 (11th Cir. 1983) (reversing conviction for kidnaping under federal statute where victim

accompanied alleged abductor on cross country trip, engaged in sexual intercourse with alleged

abductor and remained with alleged abductor despite numerous opportunities to leave and/or

seek assistance).[20]

    Here, Ms. Mercado testified that, despite her friends and family urging her not to go to

Philadelphia, she went there because she had been given a "direct order" to do so, and with the

hope of speaking with Mr. Sosa about transferring her Latin Queen membership from the

Philadelphia Chapter to the Southern New Jersey Latin King Chapter.  E. Mercado Testimony,

T.T. Feb. 1, 2006 at 50:18-19, 21; 51:6-11; 52:24-25.  She also testified that her understanding of

the ALKQN rules was that if a member of the ALKQN who did not obey a direct order, one

would be given a "violation," which could mean a beating, torture or death, and that while she

was in the Latin King house on Mutter Street she had in fact witnessed conversations between

Latin Kings in which dire threats were exchanged.  E. Mercado Testimony, Feb. 1, 2006 at 53:7-

---

    [19] Malloy was cited by Mr. Serrano as a case demonstrating circumstances supporting a
lack of consent.

    [20] Mr. Sosa cites to Chancey in support of his argument.  The Government correctly notes
that no court within Pennsylvania or the Third Circuit has cited to Chancey.

9; 60:24-25; 61:1-16.  Ms. Mercado further testified that at the time the FBI arrived and inquired

as to her well-being, she had not yet been beaten for her "violation" and that when the officers

and agents spoke with her, she believed that they could not be trusted and that she needed to

prove her loyalty to the ALKQN by demonstrating that she was not a "rat."  E. Mercado, T.T.

Feb. 1, 2006 at 65:11-25; 66:12-15.  At the point that the police spoke with her at the Latin King

house in Philadelphia, Ms. Mercado had already overheard Latin King members threatening

violence against each other, and threatening the children of other Latin Kings.  E. Mercado, T.T.

Feb. 1, 2006 at 61:3-4.  Based on this evidence from Ms. Mercado herself relating to her state of

mind, a reasonable jury could have concluded that Ms. Mercado reported as ordered to

Philadelphia and refused to disobey the orders of the Latin Kings overseeing her stay in

Philadelphia out of fear for her own safety and the safety of her family.

2.      <b>Confinement to a Place of Isolation</b>

Messrs. Sosa and Serrano next argue that Ms. Mercado was not confined to a place of

isolation, but rather was free to come and go as she pleased, could have left the premises at any

time and actually refused rescue by FBI agents who arrived to help her.

Confinement to a "place of isolation" is not limited to one of geographic isolation, but

rather has been interpreted by Pennsylvania courts to include "effective isolation from the usual

protections of society."  Commonwealth v. Jenkins, 687 A.2d 836, 838 (Pa. Super. Ct. 1996).   In

Commonwealth v. Hook, 512 A.2d 718 (Pa. Super. Ct. 1986), the court found insufficient

evidence of isolation where a woman was confronted by a stranger in the hallway of her

apartment building who then forced his way into her apartment and announced his intent to rape

her, then followed her into a neighbor's apartment and, in just over one hour, attempted to rape

27

the woman before passing out. Hook, 512 A.2d at 719. Finding that it had been improper to charge the attacker/defendant with kidnaping, the court acknowledged that a kidnaping victim might be considered to be kept in a place of isolation if the circumstances of the detention would have made discovery or rescue unlikely. Id. However, the court concluded that the victims had not been confined to a "place of isolation," because there were three occupied apartments on the floor where the incident occurred, as well as a nearby clothing store that was open for business at the time the crime occurred and the entrance to the apartment portion of the building was through a door adjoining the door to the clothing store, suggesting that the victims were far from being isolated. Id. at 720. In contrast, in Jenkins, the court found sufficient evidence of isolation where a defendant held several people inside a row home in Philadelphia at knifepoint while negotiating with the police. Jenkins, 687 A.2d at 838.

On this key issue of whether Ms. Mercado was in isolation, the Government argues that the evidence provides at least eight instances in which a jury could have found that Ms. Mercado was indeed kidnaped, including (1) the day on which Ms. Mercado was ordered to travel from her home in New Jersey to Philadelphia and report to the Latin Kings at a specific bar in North Philadelphia; (2) the point at which Ms. Mercado was ordered to leave the bar and report to the house on Mutter Street; (3) when Ms. Mercado was awakened and questioned by Mr. Sosa and then ordered not to leave; (4) when Ms. Mercado, after rejecting the offer of help from the FBI, was transported to Mr. Serrano's apartment; (5) when Ms. Mercado was transported from Mr. Serrano's apartment to the home of another defendant, Roceleen Resto, for the conduct of a Latin Kings trial; (6) when Ms. Mercado was confined for the trial and subsequently beaten at Ms. Resto's home; (7) when Ms. Mercado was transported back to Mr. Serrano's apartment,

physically unable to defend or care herself; and (8) when Mr. Sosa ordered Ms. Mercado's continued confinement and monitoring at Mr. Serrano's apartment while the Latin Kings determined whether she was an informant.

Messrs. Sosa and Serrano passionately disagree with the Government's rendition of the significance of this evidence, arguing that because Ms. Mercado had several opportunities to escape, including the opportunity to leave with the police on the second day of her confinement, there is no way a reasonable jury could conclude that she had been kept in a place of isolation for the purpose of committing a felony or terrorizing her.  For example, Mr. Serrano notes that on cross-examination, Ms. Mercado admitted that she refused to cooperate with the police and/or FBI when they arrived on March 18 because she felt that she had not as of that time been wronged, thereby refuting any claim that her travel to Philadelphia was made under duress or threat of harm.  A. Serrano Memorandum at 6.  Mr. Serrano also points out that during the roughly two week period in which Ms. Mercado stayed in Philadelphia, she moved from the house on Mutter Street to Mr. Serrano's apartment, to the home of another Latin Queen and back to Mr. Serrano's apartment.  Moreover, Mr. Serrano notes that Ms. Mercado brought her children to Philadelphia for a weekend and even traveled to Vineland, New Jersey to take steps to transfer her children from that school district to one in Philadelphia.

The Court concludes that, as perplexing as some aspects of Ms. Mercado's conduct at points during those weeks may seem when viewed in hindsight from the pristine safety of the federal courthouse two years later or on paper in legal briefs, there is sufficient evidence on the record from which a jury hearing and watching the testimony of the young woman herself could reasonably conclude that Ms. Mercado was kept in a place of isolation.  The jury is not required

to view the evidence through the prism of a skilled cross-examiner's professional cynicism, no matter how arguably appropriate that cynicism may be for defense counsel to employ. When Ms. Mercado first arrived in Philadelphia on March 17, 2004, she was ordered to go to a bar called Palma De Mar, where at least 15 Latin King members were present, and then was ordered to go to a house on Mutter Street, where defendant Elvis Ortiz secured the keys to her car. E. Mercado Testimony, T.T. Feb. 1, 2006 at 55:1-25; 56:1-19. Ms. Mercado further testified that she was then told to remain at the house on Mutter Street, and that while she was sleeping there that night, she was awakened at 2:00 or 3:00 a.m. by Mr. Sosa, in the company of Nicolas Vasquez, Angel Serrano and Elvis Ortiz. E. Mercado Testimony, T.T. Feb. 1, 2006 at 57:12-18; 58:11. Ms. Mercado testified that she was then questioned by Mr. Sosa about her knowledge regarding an incident that had recently occurred in Vineland, New Jersey, in which Mr. Sosa told Ms. Mercado more than 20 Latin King members had been arrested. E. Mercado Testimony, T.T. Feb. 1, 2006 at 58:1-5. Ms. Mercado believed that Mr. Sosa was frustrated with her because she had not previously informed him about some meetings of the New Jersey Latin King members to which she had been a witness. E. Mercado Testimony, T.T. Feb. 1, 2006 at 58:20-23. After that experience and in her presence, William Sosa told Nicolas Vasquez and Angel Serrano that Ms. Mercado needed to stay in the home on Mutter Street until the situation of her possible knowledge of the Vineland events had been resolved. E. Mercado, T.T. Feb. 1, 2006 at 61:19-22.

Ms. Mercado remained at the house on Mutter Street for another day, and she testified that she was not permitted to leave the house and was monitored by Angel Serrano. E. Mercado, T.T. Feb. 1, 2006 at 62:1-25. Ms. Mercado was later moved to Mr. Serrano's apartment, where

she was told that she was not permitted to leave, and was later taken to the home of another Latin Queen, where she was placed "on trial" for, among other ALKQN charges, treason, and was told that the penalty for treason was death. E. Mercado, T.T. Feb. 1, 2006 at 67:12; 68:1-25; 72:1-18.

Although the ALKQN decided to drop the charge of treason, Ms. Mercado was adjudged by the ALKQN to be guilty on several other charges and was sentenced to a "violation," in this instance, a physical beating, that was to last for 7 1/2 minutes. E. Mercado, T.T. Feb. 1, 2006 at 73:11-12. Ms. Mercado was then beaten until she lost consciousness, and was later taken to Mr. Serrano's apartment where she testified that he raped her. E. Mercado, T.T. Feb. 1, 2006 at 76:8-10; 81:4. Ms. Mercado did acknowledge that at an earlier point in time she had had an intimate relationship with Mr. Serrano, though that relationship had concluded by the time of the events in question. E. Mercado T.T. Feb. 1, 2006 at 165:20-25; 166:1-3. Ms. Mercado remained at Mr. Serrano's apartment until she was told by a Latin King member to drive some other members to their homes in New Jersey. E. Mercado, T.T. Feb. 1, 2006 at 89:6-7. Although she was then accompanied by some other young Latin Queens who she believed were guarding her, Ms. Mercado telephoned a friend from a pay phone, arranged to be picked up at a gas station, abandoned her van to the young Latin Queens and made her escape. E. Mercado, T.T. Feb. 1, 2006 at 92:1-19. Ms. Mercado then flew to Puerto Rico. E. Mercado, T.T. Feb. 1, 2006 at 92:23-25.

There is other evidence suggesting that Ms. Mercado was not considered to be a "guest" of Mr. Serrano, but rather was to be kept in Philadelphia for the purpose of keeping an eye on her. Nicolas Vasquez, a Latin King who, at the time these events transpired was acting as a government informant, testified that he witnessed Ms. Mercado's trial and beating, and was told

by Mr. Serrano afterward that he (Mr. Serrano) planned to take her to a wooded area in Allentown and kill her if her name was found in the "discovery package" relating to the law enforcement events that had transpired in Vineland which led to the suspicions about Ms. Mercado's loyalty.  N. Vasquez, Jan. 26, 2006 at 35:15-25; 36:1-14.[21]  Mr. Vasquez also testified that after Ms. Mercado escaped,  Mr. Serrano approached Mr. Vasquez to get directions to Ms. Mercado's home in New Jersey so that Mr. Serrano could "get her back."  N. Vasquez, Jan. 26, 2006 at 37:17-21.

The Court concludes that, at the very least, portions of Ms. Mercado's detainment in Philadelphia  afford sufficient evidence from which a jury could conclude, beyond a reasonable doubt, that Ms. Mercado was isolated against her will for a sufficiently lengthy, i.e., substantial, time to meet the requirements of the definition of kidnaping. Under Pennsylvania kidnaping law, the meaning of the term "substantial" is not limited to a certain, specific time period. Commonwealth v. Hughes, 399 A.2d 694, 696 (Pa. Super. Ct. 1979).  Indeed, a "substantial period" of time can depend on the mental state of the victim, as "the fright that can be engendered in 30 minutes can have the same debilitating effect on one person as 30 hours may have on another."  Hughes, 299 A.2d at 698.  Thus, it is possible, and would not be unreasonable, for the jury to find that even if the kidnaping did not occur over the entire span of time that Ms. Mercado was in Philadelphia, her detention in Mr. Serrano's apartment, transportation for trial

---

[21]  Counsel for Mr. Serrano makes much of the argument that because Mr. Vasquez, a government informant, was nearby to Ms. Mercado during much of the time that she was in Philadelphia, Ms. Mercado was always "protected." May 19 Tr. at 36:20-25; 37:1-10.  The testimony does not unreservedly support this argument, as Mr. Vasquez testified that he could not contact authorities as events were transpiring if other people, i.e., Latin Kings and Queens, were around.  N. Vasquez, Jan. 26, 2006 at 30:1-5.

before the ALKQN and consequential "violation" beating constitute sufficient confinement.

3.       **Evidence Relating to the Involvement of Mr. Sosa**

Mr. Sosa argues that even if the evidence with respect to this count is sufficient to support a kidnaping conviction, there is no evidence implicating him in any of the actions that took place with respect to the kidnaping of Elena Mercado. This argument is without basis. Mr. Sosa's involvement is amply supported by the evidence. Ms. Mercado testified that she was awakened in the middle of the night early in her ordeal to be questioned by Mr. Sosa about her loyalty to the ALKQN, that she heard him direct other Latin King members to ensure that she stayed in Philadelphia until the issue of her loyalty was resolved and that he was one of the Latin King members who presided over her ALKQN "trial" that resulted in her beating. E. Mercado, T.T. Feb. 1, 2006 at 57:16-18; 61:19-20; 67:20-22; 69:17-19. Portions of this testimony was corroborated by the testimony of Nicolas Vasquez. N. Vasquez, T.T. Jan. 26, 2006 at 29:5-25 (placing Mr. Sosa at the trial and subsequent "beatdown" that Ms. Mercado experienced). Because there is sufficient evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that Mr. Sosa and Mr. Serrano took part in or directed any aspect of the events that took place with respect to Ms. Mercado, their requests for acquittal with respect to this count of the indictment will be denied.

G.       **Count 13 with Respect to Mr. Melendez and Mr. Ortiz**

At the close of evidence at trial, Mr. Melendez moved for a judgment of acquittal with respect to counts 1, 7, 9, 10, 11, 12 and 13, and Mr. Ortiz moved for a judgment of acquittal with respect to counts 7, 9, 10, 11, 12 and 13. On February 28, 2006, the Court denied the motions with respect to counts 7, 11 and 12 and reserved judgment with respect to counts 9, 10 and 13.

Subsequent to the trial, the Court granted the Government's motion to dismiss counts 9 and 10 of the indictment.  Thus, the only remaining counts for which the Court must decide a motion for acquittal with respect to Mr. Melendez include counts 1 and 13, and the only remaining counts for which the Court must decide a motion for acquittal with respect to Mr. Ortiz is count 13.

Count 13 of the indictment charges that from on or about December 22, 2003 to in or about January 2004, Alex Melendez and Elvis Ortiz[22] conspired and agreed with others known and unknown to the grand jury to commit the knowing and intentional murder of a person known to the grand jury as LK-4,[23] in violation of the laws of the Commonwealth of Pennsylvania.

Mr. Ortiz and Mr. Melendez each argue that they are entitled to acquittal on count 13 because they assert that there was insufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that either of them had a specific intent to murder Mr. Guzman.  In support of this argument, Messrs. Ortiz and Melendez begin their argument by pointing out that the evidence suggests that the initial abduction and beating of Mr. Guzman was not intended to result in his death.  Mr. Ortiz specifically directs the Court to the testimony of Jonathan Santana, a testifying co-conspirator, who stated that the "terminate on sight" order directed against Mr. Guzman was not issued until after Mr. Guzman had escaped from the Mutter Street basement following his beating.  J. Santana, T.T., Feb. 8, 2006 at 145:14-19.  Mr. Santana also testified that no one, including Mr. Ortiz, actually went to Vineland, New Jersey where Mr. Guzman reportedly lived or anywhere to search for Mr. Guzman after he escaped.  J. Santana,

---

[22]  Mr. Sosa was also charged with this count of the indictment.  Mr. Sosa did not move for a judgment of acquittal with respect to this count.

[23]  LK-4 was later identified to be Rafael Guzman.

T.T. Feb. 8, 2006 at 145:20-25; 146:1-6.

Mr. Melendez asserts that when another co-conspirator, Ray Melendez, testified about the incident involving Mr. Guzman, his testimony was that Mr. Ortiz, after having been directed to find Mr. Guzman and kill him, left the premises and, instead of looking for Mr. Guzman, traveled to the home of Mr. Ortiz's uncle.  R. Melendez, T.T. Feb. 7, 2006 at 72-77.  Mr. Melendez also believes that the testimony of Aaron Martinez affirms that he was not involved in any attempt to murder Mr. Guzman because the "terminate on site" order was not issued until after Mr. Guzman had escaped.  A. Martinez, T.T. Feb. 3, 2006 at 111:24-25; 112:1-18.  Finally, both of these defendants argue that at the time Mr. Guzman was abducted, the evidence supports a finding that they did *not* want to kill Mr. Guzman for the practical reason that he had been abducted in front of witnesses who could identify them as having taken him away, which would have implicated them in a murder.  E. Vasquez, T.T. Feb. 16, 2006 at 100:24-25; 101:1-4.

Under Pennsylvania law, first degree murder is a killing that is committed by lying in wait, or is otherwise willful, deliberate and premeditated.  18 Pa. C.S. A. § 2502(a).  To be found guilty of a conspiracy to commit first degree murder, the evidence must prove, beyond a reasonable doubt, that (1) a defendant agreed with another person or group of persons that they or one or more of them would engage in the conduct which constitutes murder, or that a defendant agreed to aid such other person or group of persons in the planning or commission of a murder; and (2) that the defendant did so with the intent of promoting or facilitating the commission of the crime of murder.  18 Pa. C.S. § 903.  Additionally, there can be no conviction for criminal conspiracy absent the commission of an overt act taken in furtherance of the conspiracy.  Id.  at § 903(e).

35

The allegations in count 13 of the indictment encompass the dates from December 22, 2003 to in or about January 2004, and include the following alleged overt acts:

(1) On or about December 22, 2003, a person known to the grand jury as LK-4 (Mr. Guzman) called William Sosa and warned Mr. Sosa against causing any harm to LK-3 and LQ-1;

(2) On or about December 22, 2003, in Philadelphia, William Sosa ordered that Mr. Guzman be kidnaped from Vineland, New Jersey and brought to Philadelphia to be *beaten and killed*;

(3) On or about December 23, 2003, Aaron Martinez, Alex Melendez and Roberto Rosado kidnaped Mr. Guzman from his home in Vineland, New Jersey, threatened him with death, and took him by car, at gunpoint, to Philadelphia;

(4) On or about December 23, 2003, in Philadelphia, William Sosa, Aaron Martinez, Alex Melendez, Elvis Ortiz and Roberto Rosado confined Mr. Guzman against his will, terrorized him, severely beat him, struck him with a chair and a dangerous weapon, that is, a firearm, causing Mr. Guzman severe bodily injury;

(5) On or about December 23, 2003, in Philadelphia, William Sosa ordered that Aaron Martinez, Alex Melendez and Roberto Rosado find and retrieve a machete, to cut off Mr. Guzman's hands and that Elvis Ortiz, guard Mr. Guzman while a machete was located;

(6) On or about December 24, 2003, in Philadelphia, William Sosa ordered the murder of Mr. Guzman, after he escaped from confinement by Elvis Ortiz;

(7) On or about January 9, 2004, in Philadelphia, William Sosa issued a "Terminate on Sight" (T.O.S.) order to murder Mr. Guzman.

Thus, the charges in count 13 encompass not only the "terminate on sight" order issued by Mr.

Sosa after Mr. Guzman escaped from his confinement, but also the actions that had been taken up to that point, including kidnaping and beating him, and the expressed intent to cut off his hands.

At trial, Mr. Guzman testified that after he was abducted from his home in Vineland by, among others, Alex Melendez, Mr. Melendez held a gun to his head and forced him to get into the car with Mr. Melendez and two others.  R. Guzman, T.T. Jan. 31, 2006 at 139:17-19.  Mr. Guzman also testified that during the drive from Vineland to Philadelphia, Mr. Melendez suggested that they pull over near a deserted patch of highway, stating that "this is a nice spot, you know what I mean, it's nice and dark, we should do it here."  R. Guzman, T.T. Jan. 31, 2006 at 139:24-25; 140:1.  Shortly after Mr. Melendez's suggestion was denied by the driver of the car, Mr. Melendez turned to look at Mr. Guzman and, while waving a gun at him, said "I should blow your f***ing head right off."  R. Guzman, T.T. Jan. 31, 2006 at 140:1-10.  This statement was corroborated by the statement of Aaron Martinez, a co-conspirator in the Guzman kidnaping and beating, who testified that during the drive to Philadelphia, Mr. Melendez said of  Mr. Guzman "[t]hat we should splatter his brains all over the car and dump him over the side."  A. Martinez, T.T. Feb. 3, 2006 at 98:11-12.

The evidence also established that in participating in the kidnaping and beating of Mr. Guzman, Mr. Melendez was acting on the order of William Sosa, and that that order included placing a "terminate on site" order against Mr. Guzman.  A. Martinez, T.T. Feb. 3, 2006 at 93:6-7; 94:9-10; 23-25; 95:1-3.  Based on this evidence, a reasonable jury could find, beyond a reasonable doubt, Mr. Melendez guilty of conspiracy to commit murder.

As to Mr. Ortiz, there is evidence that after Mr. Guzman escaped from the basement where he had been held and beaten, Mr. Sosa personally ordered Mr. Ortiz to find Mr. Guzman

and kill him.  R. Melendez, T.T. Feb. 7, 2006 at 77:24-25; 78:1-5.  There was also testimony that

upon being given this order, Mr. Ortiz departed from the house with Ray Melendez.  R.

Melendez, T.T. Feb. 7, 2006 at 72:14-25; 1-6.  Moreover, although there was testimony that Mr.

Ortiz did not, in fact, actually look for Mr. Guzman after he escaped, there was also testimony

that Mr. Ortiz told Mr. Sosa that he had looked for Mr. Guzman at every bus stop and train

station.  E. Vasquez, T.T. Feb. 16, 2006 at 98:12-14.

The record also contains ample evidence that Mr. Ortiz participated in the beating of Mr.

Guzman in the Mutter Street house basement, which, as described above, was listed as an overt

act with respect to this count.  R. Guzman, T.T. Jan. 31, 2006 at 147:19-22.  Thus, there is

evidence that Mr. Ortiz was part of the overall conspiracy to abduct, beat and murder Mr.

Guzman, and that at least one overt act stated in the indictment was committed.[24]  Based on this

record, the jury was presented with sufficient evidence from which to find Mr. Ortiz guilty of a

conspiracy to commit murder.  For these reasons, the motions of Messrs. Melendez and Ortiz for

acquittal with respect to count 13 of the indictment will be denied.

H.     **Count 1 with Respect to Mr. Melendez**

Mr. Melendez was convicted of counts 7, 11, 13 and 14.  In his supplemental motion and

at oral argument, Mr. Melendez argued that he must be acquitted of count 1 of the indictment,

---

[24]  Although he did not participate in the actual abduction of Mr. Guzman and the drive to
Philadelphia, Mr. Ortiz may be found guilty for acts taken by a co-conspirator (i.e., Mr.
Melendez or Mr. Sosa).  See Commonwealth v. Lambert, 795 A.2d 1010, 1016 (Pa. Super. Ct.
2002) ("[o]nce there is evidence of the presence of a conspiracy, conspirators are liable for acts
of co-conspirators committed in furtherance of the conspiracy"); United States v. Berkery, 889
F.2d 1281, 1284 (3d Cir. 1989) (agreeing that the law of conspiracy in the Third Circuit is such
that a person may be found culpable for a conspiracy if he or she joined the conspiracy at any
point in its progress and be held responsible for what is done in furtherance of the conspiracy).

which charges a violation of the RICO conspiracy statute, because none of the evidence connecting Mr. Melendez with the predicate acts of which he was convicted demonstrates that he was aware that what he did furthered the interests of the RICO enterprise.  A. Melendez, Supplemental Motion at 5; May 19 Tr. at 26:14-15.

Of the charges on which Mr. Melendez was convicted, three constitute predicate acts for the purposes of the RICO statute.  Count 7 charged a conspiracy to distribute heroin within 1000 feet of a public elementary school, count 11 charged that Mr. Melendez, for the purpose of maintaining and increasing his position in the enterprise, kidnaped Rafael Guzman, and count 13 charged that Mr. Melendez, for the purpose of maintaining and increasing his position in the enterprise, conspired to murder Rafael Guzman.[25]

At oral argument on the motion, counsel for Mr. Melendez argued that the Court should set aside Mr. Melendez's conviction on counts 7 and 13, and thereby eliminate two of the three predicate acts supporting his conviction on count 1.  May 19 Tr. at 26:14-15.  As discussed above, the Court has concluded that there was sufficient evidence from which a jury could convict Mr. Melendez with respect to count 13, and Mr. Melendez was convicted of count 11 of the indictment.  Thus, there is sufficient evidence to support Mr. Melendez's conviction with respect to two predicate acts for the purposes of the RICO statute, and the only basis upon which an acquittal might be appropriate would be if the Court were to conclude that Mr. Melendez did not agree to participate in a criminal racketeering enterprise or did not deliberately join such an enterprise with knowledge of its purpose.

---

[25]  Count 14, which charged use and carrying of a firearm during a violent crime, is not a predicate crime for conviction under the RICO statute.

However, at oral argument, counsel for Mr. Melendez focused on count 7 of the

indictment,[26] which charged Mr. Melendez with conspiracy to distribute heroin within 1000 feet

of a public school.[27]   Mr. Melendez specifically argues that the drug business with respect to the

Latin Kings was solely an agreement between Mr. Sosa and Edwin Vasquez, a government

informant, and that the only evidence linking Mr. Melendez to any drug trade was Mr.

Melendez's presence when Mr. Vasquez was beating a drug dealer who owed money for illicit

products.  May 19 Tr. at 32:19-25.  Mr. Melendez further argues that even if his tangential

participation in Mr. Vasquez's drug organization could be accepted by a jury, "it would take a

hallucination, given the . . . evidence, to relate the drug sales to the 'activities of the enterprise.'"

A. Melendez, Supplemental Memorandum at 3.

Based on a clear-eyed, non-hallucinating review of the record, the Court disagrees with

Mr. Melendez's assessment of the evidence.  There was a significant array of evidence from

which a reasonable jury could conclude, beyond a reasonable doubt, that certain members of the

Latin Kings were involved in the sale of drugs as charged in the indictment.  Edwin Vasquez

testified that he had a conversation with Mr. Sosa about the drug sales and the fact that such sales

were a violation of the supposed Latin King rules.  E. Vasquez, T.T. Feb. 16, 2006 at 72:18-25.

---

[26]  The Court notes that Mr. Melendez's motion for judgment of acquittal with respect to count 7 was denied before the case was sent to the jury.  Therefore, the Court interprets counsel's request as a motion for reconsideration of that decision.

[27]  The Court has concluded that there was sufficient evidence to support the conviction of Mr. Melendez with respect to two other predicate racketeering acts, that is the kidnaping and conspiracy to murder Rafael Guzman.  Thus, it is not relevant to count 1 for the Court to engage in an analysis with respect to count 7.  However, because counsel for Mr. Melendez asked the Court to reconsider the evidence supporting Mr. Melendez's conviction on count 7, the Court conducts include an analysis of this count.

Mr. Vasquez testified that during this conversation, he was not told that Latin King members could not participate in the drug operation, but rather that they could not wear their Latin King "colors" while participating. E. Vasquez, T.T. Feb. 16, 2006 at 1-3. Mr. Vasquez further testified that he was told that Mr. Sosa was to be paid ten percent (10%) of the proceeds of all drug sales resulting from the efforts of the participating members. E. Vasquez, T.T. Feb. 16, 2006 at 5-7. Additionally, as was acknowledged at oral argument, the statements during a gathering of Latin Kings and Queens of co-conspirator, Leyda Rey-Gonzalez, that ten percent of the proceeds of all drug sales had to be paid over to the Latin Kings was captured on a videotape provided by a government informant. See Government Ex. 805; May 19 Tr. at 28:17-25; 29:1-5.

There is also ample evidence that members of the Latin Kings participated in various beatings of drug dealers who had stolen either drugs or money from Mr. Vasquez. E. Vasquez, T.T. Feb. 16, 2006 at 73:24-25; 74:1-25; 75:1-25; 76:1-15. During at least one of these beatings, references were made to revenge for not paying "brothers," thereby implying that the drug operation was that of the Latin Kings. E. Vasquez, T.T. Feb. 16, 2006 at 75:18-19. Thus, there is sufficient evidence from which a jury could have found, beyond a reasonable doubt, that Latin King members were participants in the drug conspiracy.

With respect to Mr. Melendez's participation in the various drug business beatings by Latin Kings, there is evidence that Mr. Melendez was aware of the drug trade and the related beatings. For example, Mr. Vasquez testified that in one instance, Mr. Melendez walked into Mr. Vasquez's house while a beating was taking place, and began to participate in the beating. E. Vasquez, T.T. Feb. 16, 2006 at 77:13-14. Mr. Melendez then took a more active role in the beating, suggesting that the victim be taken to Mr. Vasquez's backyard to be attacked by a pit

bull.  E. Vasquez, T.T. Feb. 16, 2006 at 77:18.  A reasonable jury could have concluded that if Mr. Melendez really was unaware of any such conspiracy or unwilling to participate in it, he would not have behaved in this fashion.  As a member of the drug conspiracy, Mr. Melendez would be responsible for any actions taken by his co-conspirators in furtherance of the conspiracy that were reasonably foreseeable.  United States v. Cross, 308 F.3d 308, 312 n.4 (3d Cir. 2002).

Based on the evidence presented at trial as discussed above, a reasonable jury could have concluded that certain Latin King members were involved in a drug conspiracy and that Mr. Melendez was aware of and participated in such a conspiracy.  As such, Mr. Melendez's conviction with respect to count 7 of the indictment is supported by sufficient evidence, and Mr. Melendez's related motion for acquittal with respect to count 1 of the indictment will be denied.

CONCLUSION

For the reasons discussed above, each of the Defendants' motions for acquittal and Mr. Sosa's alternative motion for a new trial will be denied.  An appropriate Order follows.

_____S/G.E.Pratter_____
Gene E.K. Pratter
United States District Judge

June 15, 2006

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| WILLIAM SOSA, ALEX | : | |
| MELENDEZ, ANGEL SERRANO, | : | |
| AND ELVIS ORTIZ | : | No. 05-44 |

**O R D E R**

**AND NOW**, this 15th day of June, 2006, upon consideration of the Motion of Defendant

William Sosa for Judgment of Acquittal or, In the Alternative, a New Trial with Respect to

Counts 3, 4, 6, 9, 10, 12, 14 and 17 of the Indictment (Docket No. 538), the Supplemental

Motion for Judgment of Acquittal of Alex Melendez (Docket No. 533), the Motion for Judgment

of Acquittal Pursuant to Rule 29 Federal Rules of Criminal Procedure of Angel Serrano (Docket

No. 537), the oral Motion of Elvis Ortiz for Judgment of Acquittal with Respect to Count 13 of

the Indictment, the omnibus response thereto (Docket No. 551) and after oral argument on the

motions, it is **ORDERED** that the Motions are **DENIED**.[28]

**BY THE COURT:**


s/ Gene E. K. Pratter
**GENE E.K. PRATTER**
**United States District Judge**

---

[28] The Court notes that because the Government subsequently dismissed counts 9 and 10
of the indictment, any motion for acquittal with respect to those counts is denied as moot.