IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| WILLIAM SOSA | : | No. 05-044-1 |
| a/k/a "King Homicide" | : | |

**MEMORANDUM**

PRATTER, J.                                                                                                    JANUARY 7, 2021

William Sosa seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Sosa requests relief based on the COVID-19 pandemic and alleged medical conditions that he believes place him at an increased risk of harm from the virus. The Government opposes Mr. Sosa's motion, given that he presents a danger to the community, has served less than 16 years of a life sentence, and does not present any medical conditions that constitute an extraordinary and compelling reason to justify his release. For the following reasons, the Court denies the motion.

**BACKGROUND**

**I.    Mr. Sosa's Criminal Conduct**

Mr. Sosa was the Pennsylvania leader of the Latin Kings, a highly organized nationwide gang involved in violent crimes and drug trafficking. The network enforces discipline through a hierarchy of titles and a detailed punitive system. Sitting at the apex of the Pennsylvania chapter, Mr. Sosa ordered beatings, kidnappings, and murders, directed drug trafficking, and forced payments from members through violence and fear. He also sought to expand his reign of terror into New Jersey.

In 2007, he was indicted in 25 counts in a 26-count indictment, including one count of conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d); eight

1

counts of conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); one count of conspiracy to distribute 1,000 grams or more of heroin, in violation 21 U.S.C. § 846; three counts of kidnapping in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); two counts of conspiracy to kidnap in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); two counts of conspiracy to maim in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(6); one count of attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); six counts of using and carrying a firearm during a violent crime, in violation of 18 U.S.C. § 924(c). Each of these 25 counts arose directly from his leadership of and active participation in the Latin Kings.

After perjuring himself at trial, Mr. Sosa was convicted of 14 of the 25 counts. He was sentenced to life imprisonment with a consecutive mandatory 85-year term. He was also fined $5,000—the vast majority of which is outstanding. The Third Circuit Court of Appeals affirmed both Mr. Sosa's convictions and sentence. *United States v. Melendez*, 388 F. App'x 178 (3d Cir. 2010).

Mr. Sosa is serving his sentence at FCI Schuylkill. He has no anticipated release date. He has served approximately 16 years. The Bureau of Prisons does not report that he has committed any disciplinary infractions while incarcerated.

**II.     Mr. Sosa's Request for Compassionate Release and Medical Records**

On June 1, 2020, Mr. Sosa requested compassionate release from the warden of the facility where he is confined. He sought relief based on his asthma and hypertension and fear of contracting COVID-19 while incarcerated. The warden denied his request on June 29, 2020. Mr. Sosa then filed this motion *pro se*.

Despite Mr. Sosa's claims of asthma and hypertension, his medical records for the past six years reveal that he does not suffer from any such conditions. He had a skin rash, for which he received medication, and has had headaches, which were treated with Motrin. His records are devoid of any instances of high blood pressure in 2020. He is reportedly fully ambulatory and engages in all normal activities of daily living within the prison.

### III. BOP's Response to the COVID-19 Pandemic

BOP's "highest priority [is] to continue to do everything [it] can to mitigate the spread of COVID-19 in [its] facilities,"[1] and it has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012.[2] The protocol established a phased framework which requires BOP facilities to begin preparations in the face of a suspected outbreak overseas and further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. BOP began planning for potential COVID-19 transmissions as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions nine months ago, in March of this year.

Presently, BOP operations are governed by Phase Nine of the Action Plan. The current modified operations plan permits only limited group gathering, with attention to social distancing efforts to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. BOP has limited the movement of inmates and detainees among its facilities. Moreover,

---

[1] BOP, *BOP Modified Operations* (last updated Nov. 25, 2020), available at https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Jan. 6, 2021).

[2] BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited Jan. 6, 2021).

3

official staff travel has been suspended, as has most in-person staff training. BOP is endeavoring to regularly issue face masks to all staff and inmates, and strongly encourages masks to be worn in public areas where social distancing cannot be achieved.

Inmates who travel outside of a BOP institution, such as for court appearances, are to be quarantined upon their return. Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in medical isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the CDC criteria for release from isolation. The Program Review Division will conduct unannounced site visits to ensure compliance with the Health Services Division and the CDC's guidance.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[3] Pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act, BOP may also "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136 § 12003(b)(2). In April 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that have seen the greatest incidence of COVID-19 transmission thus far.

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to

---

[3] This authority includes the ability to place an inmate in home confinement during the last six months or the remaining 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

adjust its practices accordingly to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Mr. Sosa currently lives at FCI Schuylkill. Up until last month, only one inmate and five five staff members were previously positive for COVID-19. As of January 6, 2021, 54 inmates and 13 staff members are currently COVID-positive.[4] There have been no COVID-19 related deaths. Although there was a outbreak of the virus late last year, the facility responded with extensive testing and quarantine practices. All inmates who have tested positive are currently isolated while they are treated and recover.

### LEGAL STANDARD

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization." *McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007). However, a defendant can move to reduce his or her term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). In order to do so, the defendant must first request that the BOP file a motion on his or her behalf,[5] which can only occur after he or she has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

---

[4]   The data is current as of January 6, 2021, according to the BOP website, available at https://www.bop.gov/coronavirus.

[5]   "The recently enacted First Step Act allows 'incarcerated defendants to seek compassionate release from a court on their own motion, not just through the Bureau of Prisons.'" *United States v. Perri*, No. 15-cr-486, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (quoting *United States v. Mark*, No. 10-cr-742-1, 2020 WL 5801495, *1 (E.D. Pa. Sept. 29, 2020)).

In the event the moving defendant complies with the exhaustion requirement,[6] a court may reduce his or her term of imprisonment if it finds that extraordinary and compelling reasons warrant such a reduction, that the reduction is consistent with the Sentencing Commission's applicable policy statements,[7] and that the § 3553(a) factors favor reduction. Pursuant to the Sentencing Commission's relevant policy statement, a court must also find that the defendant is not a danger to the safety of any person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2).

Although Congress has not defined the term "extraordinary and compelling," the Sentencing Commission has issued an application note to its relevant policy statement which provides guidance for defining the conjunctive term. Application Note 1 provides, in pertinent part, that a defendant's non-terminal illness may constitute an extraordinary and compelling justification where "the defendant is suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13.

A court considers multiple factors under 18 U.S.C. § 3553(a), including, among other things, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to protect the public from further crimes of

---

[6]  The Government does not contest that Mr. Sosa has met the exhaustion requirement.

[7]  Despite § 3582(c)(1)(A) mandating that a reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission," "the policy statement is now clearly outdated" in light of the Sentencing Commission's failure to update its policy statement to account for the changes imposed in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018. *United States v. Rodriguez*, 451 F. Supp. 3d 392, 397 (E.D. Pa. 2020). Therefore, although the policy statement undoubtedly provides helpful guidance, it "does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)." *Id.* at 398.

the defendant"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentenced imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." The defendant bears the burden of showing that a reduction in sentence is proper. *United States v. Rengifo*, No. 13-131, 2020 WL 4206146, at *2 (M.D. Pa. July 22, 2020) (citing *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016)); *see also United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

## DISCUSSION

The Court will deny Mr. Sosa's motion He fails to present an extraordinary and compelling reason to justify his release. Indeed, his purported medical ailments find no support in six years of BOP records. Moreover, release is not warranted given the undeniable danger he poses to the community.

To be clear, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune individual, does not provide a basis for a sentence reduction on its own. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (holding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread"); *see also United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."). So, Mr. Sosa's generalized fear of contracting COVID-19 while incarcerated does not a constitute extraordinary and compelling reason for release.

Although COVID-19 is a dangerous, and sometimes lethal, virus for all individuals, the Centers for Disease Control and Prevention (CDC) has deemed certain people with specific underlying medical conditions and the elderly to be at a heightened risk of severe illness or death.[8] "While this court is not bound by the CDC's guidelines, it follows suit with many other district courts who have turned to the guidance as reliably informative." *United States v. Perri*, 2020 WL 6324384, at *2 (E.D. Pa. Oct. 28, 2020) (listing cases).

As demonstrated by his medical records, there is no evidence that Mr. Sosa, who is 42 years old, suffers from a condition that is considered "high-risk." Mr. Sosa claims that he has asthma and hypertension. But these claims find no support in his medical records. Nor would it be the first time Mr. Sosa has made false assertions to this Court.

Moreover, were Mr. Sosa to present asthma and hypertension, the CDC has classified both conditions as those which "might" increase a person's risk for severe illness. Insufficient data exists to say more. Courts routinely deny motions for the extraordinary remedy of compassionate relief based only on potential COVID-19 risk factors, like hypertension and asthma. *See, e.g.*, *United States v. Moldover*, No. CR 14-637, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (defendant's asthma, hypertension, and obesity did not constitute extraordinary and compelling reason for release); *United States v. Daniels*, No. CR 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) ("hypertension does not warrant compassionate release").

In the absence of a demonstrated health concern and diagnosed medical condition, Mr. Sosa's self-diagnosed conditions do not present an extraordinary and compelling justification for his compassionate release.

---

[8] *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention (Dec. 29, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Jan. 6, 2021).

But even if Mr. Sosa had a requisite serious medical condition, he is not eligible for early release. Mr. Sosa fails to establish that an early release aligns with the statutory sentencing factors, notably the seriousness of his offense, the need to promote respect for the law, the need to provide just punishment for the offense, and the need to deter others from similar criminality. *See* 18 U.S.C. § 3553(a).

Construing his motion liberally, he claims that release is justified because of his conduct while incarcerated and professed rehabilitation. The Court certainly commends Mr. Sosa for not incurring any disciplinary infractions for the past 16 years and for completing multiple programs and maintaining steady employment. But even if the Court accepts Mr. Sosa's representation that he is "a changed man" and is prepared to be a role model to his children and an "upstanding law-abiding citizen," his rehabilitative efforts alone cannot outweigh the other § 3553(a) factors. Congress has explicitly stated that "rehabilitation of the defendant alone" is insufficient for compassionate release. 28 U.S.C. § 994(t).

The Court cannot nor will it overlook the seriousness of Mr. Sosa's spree of violent crimes for which the Court imposed a "Life plus 85" sentence, and which the Third Circuit Court of Appeals affirmed on appeal. As the head of the Philadelphia chapter, Mr. Sosa oversaw all gang operations in the area, including—but not limited to—ordering murders and kidnapping to broaden the Latin King's drug trafficking footprint. He was not only a willing participant in organized crime but presided over a reign of terror.

Mr. Sosa's crimes are serious and underscore the danger he poses to the community. He does not offer any evidence to suggest otherwise. Nor does he explain how serving only 16 years of a "Life plus 85" sentence reflects the nature and circumstances of his offenses and promotes just punishment.

Courts within this Circuit have denied the extraordinary relief Mr. Sosa requests in similar situations. This is true even when a defendant presents definite risk factors, which Mr. Sosa does not. *See, e.g., United States v. Spencer*, No. CR 95-659, 2020 WL 6504578 (E.D. Pa. Nov. 5, 2020) (release denied to defendant with COPD who served over 20 years of a life sentence for ten armed robberies, given the nature of the offenses and his criminal record); *United States v. Ordaz*, 2020 WL 5993289 (E.D. Pa. Oct. 9, 2020) (denying release to 61-year old defendant with hypertension and hyperthyroidism who led a violent drug organization and had served less than two-thirds of a 420-month sentence); *United States v. Brunetti*, 2020 WL 4516541 (E.D. Pa. July 31, 2020) (denying release to crime family member who served 26 years of 40-year sentence due to the nature of the offenses).

Considering all the relevant facts, the gravity of Mr. Sosa's crimes and the danger posed to the community warrant the sentence as imposed. *See United States v. Pawlowski*, 967 F.3d 327, 331 (3d Cir. 2020) (noting district court reasonably concluded early release not warranted where defendant's "crimes were extraordinarily serious" and required "a significant period of incarceration").

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Sosa's motion for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i). An appropriate order follows.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE